UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jared and Wendy Rosati,

          Plaintiffs,

v.

Pine County et al.,

          Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 18-3120 (MJD/LIB)

---

Matthew E. Anderson, Anderson Law Group, PLLC, Counsel for Plaintiffs.

Jessica E. Schwie, Kennedy & Graven, Chartered, Counsel for The County.

---

This matter is before the Court on Defendants' (hereinafter referred to as "the County") motion for summary judgment.  [Doc. No. 43]

## I.     Introduction

Plaintiffs entered into a contract for deed ("CD") for the purchase of a home from their elderly neighbor, SB.  When SB executed the CD, she was living in a nursing home.  As such, Minnesota law rendered her a categorical vulnerable adult.  Minn. Stat. §§ 626.557, subd. 3; 626.5572, subd. 21.  Minnesota law further proscribes against the maltreatment, including financial exploitation, of vulnerable adults.  Id.

1

SB did not report the income from this transaction which resulted in a medical assistance fraud investigation.  That investigation led to a separate maltreatment investigation, which found that an allegation of financial exploitation by Plaintiff Jared Rosati ("Rosati") against SB was substantiated. Eventually, the finding of maltreatment was reversed.

Plaintiffs have filed this action challenging the actions of the investigators and those alleged to have assisted the investigation.

A.    Factual Background

In the 1990s, Rosati was a deputy with the Pine County Sheriff's Office. (Schwie Decl. [Doc. No. 39], Ex. F (Rybak Dep. at 15).)  In 1998, Rosati ran for the Pine County Sheriff position while employed as a deputy, and he asserts that during his campaign, he blew the whistle on corruption in the Sheriff's department.  (Id., Ex. D (J. Rosati Dep. at 25, 123-27).)  Rosati claims that he named several Pine County deputies who would have had reason to resent him for uncovering improper conduct.  (Id.)  Rosati lost the race and was fired shortly thereafter.  (Id. at 25.)  Rosati again ran for Sheriff in 2006 and lost.  (Id.)

In 2014, Rosati again ran for Sheriff against Defendant Jeff Nelson, and lost. (Id. at 25-26.) Nelson is the current Pine County Sheriff. During the race, the two exchanged campaign jabs. (Id. at 109.)

Plaintiffs live in a home that abuts the subject property that was owned by SB. (Id., Ex. C (W. Rosati Dep. at 25, 63-64); Ex. D (J. Rosati Dep. at 54-55, 63-64, 71, Dep. Ex. 35 at 2).) SB's husband had passed away and she had no children of her own, and no consistent contact with her stepchildren. (Id. Ex. C (W. Rosati Dep. at 68-70).) SB maintained the farm and had a will that named certain beneficiaries. (Id. at 64, 66-68, 170; Dep. Ex. 41 [Doc. No. 39-3 at 97-107].) During the period relevant to this case until her death, SB resided at the Lakeside Medical Center in Pine City, Minnesota. (Id. Ex. K (Dep. Ex. 63).)

In March 2016, Kathy Borowick, a Pine County Adult Protection Services ("APS") investigator received a call from Rosati about SB's placement in a nursing home. (Anderson Aff., Dep. Ex. 87 at 001715.) He told Borowick that he believed SB had been financially exploited by her stepson. (Id.) He also reported that he had discussed with SB the purchase of her property. (Id.) He offered to help APS investigate possible financial exploitation of SB. (Id.)

Sometime around April 2016, a public health nurse visited with SB to discuss assisted living options.  (Id. at 001716.)  SB reported that she wanted to go home, but the nurse explained that going home was not a safe option.  (Id.)

In June 2016, Borowick met with SB at the nursing home during which time they discussed that a nursing home placement was in her best interests.  (Id. at 001718.)  Rosati and Missy Hermanson, another neighbor and employee of the nursing home, were present.  (Id.)  Additional cognitive testing was ordered, and guardianship was discussed.  (Id.)  At that meeting, Rosati presented SB with an appraisal of her property.  (Id.)

In December 2016, Borowick closed her file on SB following the latest cognitive testing which showed SB had the capacity to live independently, and that she had the capacity to make decisions on her own and obtain assistance when needed.  (Id. at 001719.)

Plaintiffs consulted with a local attorney, Michael Bjerke, about legal documents related to the purchase of SB's home.  (Anderson Aff., Dep. Ex. 5; Dep. Ex. 12.)  Plaintiffs assert that SB wanted to sell her home on a contract for deed because she had sold other property using such a contract.  (Schwie Decl. [Doc. No. 39], Ex. D (J. Rosati Dep. at 77).)  Bjerke prepared the CD on Plaintiffs'

behalf but put Jared Rosati's name as the drafting party to avoid the parties

having to pay closing costs and other fees.  (Id., Ex. A (M. Bjerke Dep. at 50).)

Bjerke also prepared a transfer on death deed ("TODD") for the subject property.

(Id. at 60.)

On January 22, 2017, Plaintiffs and SB signed the CD and TODD in the

presence of a notary, Cheryl Bjerke,[1] at the nursing home where SB resided.  (Id.

Ex. B (C. Bjerke Dep. at 32-33); Ex. C (W. Rosati Dep. at 78, 120-21); Ex. D (J.

Rosati Dep. at 186-89).)  The record shows that SB was not represented by

counsel on that date and there is no evidence to show that SB was informed

about the pros and cons of signing a CD and TODD prior to her signing the

documents, or that anyone asked SB questions about the terms of the contracts to

determine whether or not she understood them.  (Id. Ex. A (M. Bjerke Dep. at 56-

57, 63, 68-69); Ex. B (C. Bjerke Dep. at 31-37, 40-43, 65, 67, Dep. Ex. 15 [Doc. No.

39-1] (Transcript of Cheryl Bjerke Interview at 4-5); Ex. C (W. Rosati Dep. at 123-

24); Ex. D (J. Rosati Dep. at 74-76, 189-90, 195).)

The CD set forth the purchase price for the home as $233,000 payable as

follows:  $3,800 in hand paid, and the remainder payable in monthly installments

---

[1] Cheryl Bjerke is the wife of Michael Bjerke, Plaintiffs' attorney.

of $900 until December 1, 2023, when any unpaid balance would be due and payable in full, with interest at 4% per annum.  (Id., Ex. A (M. Bjerke Dep. Ex. 5 [Doc. No. 39-1 at 278-283].)  The TODD conveyed and quitclaimed all of SB's interests in the property to Plaintiffs upon SB's death.  (Id. at 284-85.)

Thereafter, Plaintiffs took ownership of the property and rented it out for $800 per month.  (Id. Ex. C (W. Rosati Dep. at 19); Ex. D (J. Rosati Dep. at 22).)

At some point in April 2107, SB's medical assistance file was flagged when it was discovered that she had sold her home and did not report it despite the fact there was a medical assistance lien on her real property.  (Id. Ex. F (Rybak Dep. at 33-34, 37-38, Dep. Ex. 98).)  Kari Rybak is the Pine County Welfare Fraud Investigator that looked into whether SB had in fact sold her home and had failed to report the sale.  (Id. at 7, 32.)

Rybak has been an employee of Pine County since 1995, starting as a dispatcher, then a jailer, bailiff, civil process server, and a juvenile investigator/liaison officer.  (Id. at 13.)  From 1995 through 2000, Rybak worked with Rosati before his employment was terminated.  (Id. at 15.)  After Rosati was terminated, Rybak testified that she had minimal contact with Rosati, professionally and socially.  (Id.)  In about 2009, Rosati claims that Rybak made

sexual advances toward him, and that he did not reciprocate.  (Id. Ex. D (J. Rosati

Dep. at 36-37).)  Rybak denies having nothing more than a friendship with

Rosati.  (Id. Ex. F (Rybak Dep. at 17).)

As a welfare fraud investigator, Rybak conducts criminal and civil

investigations and interviews concerning suspected violations of public

assistance programs.  (Id. at 8.)  After being informed of the sale of SB's property,

and that a medical assistance lien had previously been placed on the property,

Rybak obtained property tax records concerning the property.  (Id. at 34.)

On July 24, 2017, Rybak interviewed SB at the nursing home and she

recorded the interview on her work cell phone.  (Id. at 77.)  The interview was

conducted in SB's room, with the door closed.  (Id. Ex. F (Rybak Dep. Ex. 104

(Transcript of Interview at 1).)  During this interview, SB told Rybak that she sold

her home to Plaintiffs on a CD and that she had received a down payment, and

monthly payments.  (Id. at 11.)  SB also stated that she had received checks from

Plaintiffs, but never deposited them.  (Id. at 20-21.)  Later in the interview, SB

told Rybak that Plaintiffs made the down payment in the form of two debit

cards.  (Id. at 54.)

Two days later, on July 26, 2017, Rybak received a call from Rosati, who wanted to know why Rybak was talking with SB.  (Id., Ex. F (Rybak Dep. at 109).)  Rosati told her that because of her conversation with Rybak, SB was worried about going to jail.  (Id.)  He also stated that SB did not get a down payment of $3,800 and that Michael Bjerke made an error in putting that in the CD.  (Id. at 109-110.)  Because this information was inconsistent with what SB told Rybak during the interview, Rybak believed she was mandated to report to the Minnesota Adult Abuse Reporting Center ("MAARC") possible financial exploitation of SB.  (Id. at 110,  Dep. Ex. 106.)

Rybak continued her investigation and during a second interview with SB, SB told Rybak that she made Rosati her power of attorney, but that she was not comfortable doing so.  (Id. Dep. Ex. 105 (Transcript of Second Interview at 6).)  SB believed she gave Rosati permission to do her financials.  (Id. at 14.)  SB also told Rybak that she believed she was tricked concerning the sale of her home.  (Id. at 38.)  SB further clarified that she did not receive a cash down payment when she signed the CD, but that the down payment was in the form of Plaintiffs putting an air conditioner in the home.  (Id. at 50.)  Thereafter, Rybak filed a second report to the MAARC on August 8, 2017.  (Id. at 109, 123-24, Dep. Ex. 108.)

The investigation based on Rybak's MAARC reports was assigned to
Andrea Weiner, who is an APS investigator in the Pine County Health & Human
Services department ("PCHHS").  (Id. Ex. E (Weiner Dep. at 8).)  A criminal
investigation involving Plaintiffs was conflicted out to the Chisago County
Sheriff's Office.  (Id. Ex. L (Nelson Dep. at 17, 44).)  The Pine County Attorney's
Office also recused from the investigation involving Plaintiffs.  (Id. Ex. M
(Fredrickson Dep. at 7-8).)

Following the commencement of the maltreatment investigation, a
conservator was appointed to represent SB, who then filed a petition on SB's
behalf to set aside transactions and to redress the issues of alleged financial
exploitation.  (Id., Ex. D (J. Rosati Dep. Ex. 61).)  Ultimately, in January 2018, the
conservator and Plaintiffs settled the petition by which Plaintiffs agreed to obtain
a mortgage and pay off the CD.  (Id. Ex. E (Weiner Dep. Ex. 84).)  The Settlement
Agreement and Mutual Release entered in the conservatorship proceeding
provided "The parties agree that the Contract and TODD are valid and were not
the product of deceit, mistake, undue influence, fraud, lack of capacity, or any
other condition that would invalidate the Contract and TODD."  (Id. at ¶ 4).)

In the meantime, Weiner's investigation continued and in April 2018, she concluded that the allegations of financial exploitation against Jared Rosati were substantiated and that the allegations were false – that is no maltreatment – as against Wendy Rosati.  (Id. Ex. E (Weiner Dep. Ex. 64 (Vulnerable Adult Maltreatment Investigation Summary at 10).)

The bases for the finding of maltreatment against Rosati included evidence that the CD provided for a $3,800 down payment, but that no such cash payment was made.  (Id. at 9.)  Rosati claimed that the down payment was made in the form of repayment for an air conditioning unit that he put into SB's home about a year before the sale, but he could not document how the remainder of the down payment was made.  (Id.)  In addition, Rosati could not document that he made the January 2017 payment on the CD, claiming he made the payment in cash.  (Id.)  He also claimed that he purchased debit cards for SB, and provided her checks, but SB never deposited the checks or used the debit cards.  Rosati was also unable to demonstrate that he made the April 2017 payment.  (Id.)

Rosati had also filled out a Power of Attorney for SB with a notary public, which stated that he was granted all powers regarding SB's assets and financial matters.  (Id. at 10.)  Weiner believed this showed that Rosati was aware that SB

was struggling with her decisions.  (Id.)  Rosati claimed that he had a

cancellation done, but no documentation was produced to demonstrate such

cancellation.  (Id.)

Plaintiffs requested reconsideration of the maltreatment determination,

and initially the finding was upheld.  (Id., Ex. K at 1041.)  Plaintiffs then appealed

to the PCHHS, and after an independent review of the record, the PCHHS

informed Plaintiffs by letter dated August 23, 2018 that it had determined that

the maltreatment determination was not appropriate and had rescinded the

maltreatment determination.  (Anderson Aff. Ex. CC.)  The Chisago County

Attorney declined criminal prosecution.  (Schwie Decl., Ex. D (J. Rosati Dep. at

116).)

### B.     Allegations in Support of Plaintiffs' Claims

Plaintiffs claim that the welfare fraud and maltreatment investigations

were conducted recklessly, and as a result, their substantive due process rights

were violated.  The claims of recklessness include that Rybak falsified her two

MAARC Reports, and that she was motivated to do so by personal spite based

on an alleged failed sexual relationship between Rybak and Rosati that took

place in approximately 2009.  Plaintiffs also believe Rybak's investigation was

tainted because she believed unfounded rumors about Rosati's conduct as a

peace officer; that he was dishonest and that he engaged in bad faith dealings.

(Id. Ex. F (Rybak Dep. at 23).)

Plaintiffs point to a number of discrepancies in the MAARC reports, such

as that Rybak reported that SB was extremely vulnerable, but that other evidence

showed that Rybak was unclear of SB's cognitive abilities, and that Rybak

believed SB was competent to make the decision to consent to a closed-door

interview, that she could have requested an attorney be present, that she could

consent to a fourth amendment search and know that Rybak was investigating

her for a criminal offense. (Id. Ex. F (Rybak Dep. Ex. 106 at 7-8).) Plaintiffs also

point out that Rybak included the wrong dates of the CD and the TODD, and

falsely reported that SB was alone in the room when she signed the CD, and that

Rybak changed the dollar amount of loss from $3,800 to $233,000 based on the

same contracts that were the center of the first report. (Id.)

Plaintiffs claim that the maltreatment investigation was also conducted

recklessly because it was initiated by biased individuals and conflicted agencies

based on his prior employment at Pine County, and his three failed attempts to

be elected Pine County Sheriff. Plaintiffs assert that as a result, the Pine County

Sheriff's Department and the Pine County Attorney's Office should have played no part in the maltreatment investigation.

Plaintiffs also contend that investigator Weiner had a conflict of interest because her aunt, Janet Weiner, was a real estate agent who had previously worked with SB on a different land sale.  (Schwie Decl. [Doc. No. 39], Ex. K (Dep. Ex. 63 at 52, 56).)  Plaintiffs claim that Rybak also assisted Weiner in her investigation and provided her false information, such as that the CD did not provide for interest, worked with Weiner to secure a conservator for SB and discussed other matters concerning SB's money.  (Anderson Aff., Dep. Ex. 73; Ex. BB (Dep. Ex. 129 at 1081, 1092).)

Plaintiffs also claim that even though the conservatorship proceeding had been settled, and that the Settlement Agreement included a finding that SB was not victimized, Weiner continued with her investigation.  Plaintiffs further claim that Weiner was aware of a prior investigation of SB and the result of such investigation was that SB was competent, and that Pine County staff was helping SB and Plaintiffs with the planned purchase of SB's property, and that Pine County told SB she had to sell her home.  (Id. Dep. Exs. 74 and 75.)

Plaintiffs filed the instant action claiming that the County: falsified maltreatment reports under Minn. Stat. § 626.557, subd. 6; violated their rights to due process under 42 U.S.C. § 1983; defamed them under Minnesota law; engaged in abuse of process under Minnesota law; malicious prosecution; and are liable to them for damages for willfully violating Minn. Stat. § 13.08 by failing to establish procedures that ensure requests for data are complied with in an appropriate and prompt manner.

## II.     Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).  The party opposing summary

judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

III.   **Discussion**

   A.   **Dismissal of Sheriff's Office and Health and Human Services**

   The County argues that dismissal of the Sheriff's Office and PCHHS is appropriate as they do not have a legal existence distinct from the County and cannot be sued.  See e.g., See Ketchum v. City of West Memphis, Ark., 974 F.2d 81, 82 (8th Cir. 1992) (dismissal of defendant police department was proper as it was not a juridical entity, only a department of the city government); Tisdell v. Crow Wing Cty, No. CIV. 13-2531 (PJS/LIB), 2014 WL 1757929, at *3 (D. Minn. Apr. 30, 2014) (finding that under Minnesota law, cities and counties are municipal entities subject to suit, while their sheriff's departments are not); Jones v. Brown County Family Services, Civ. No. 11-568 (SRN/FLN), 2011 WL 3163308 (D. Minn. Jul. 27, 2011) (county family services lacked capacity to be sued); Polta v. City of St. Paul Police Dept., CIV 06-1014 (PAM/AJB), 2006 WL 1174210, at *2 (D. Minn. May 1, 2006) (sheriff's department lacks capacity to be sued).

   Plaintiffs have not responded to this argument.

Based on the applicable law set forth above, the Pine County Sheriff's

Department and PCHHS will be dismissed.

**B.    Section 1983 Claim**

**1.    Whether Plaintiffs Have Alleged a Constitutional Violation**

In Count II of the Amended Complaint, Plaintiffs allege that the County

violated their due process rights by conducting a reckless investigation by

manufacturing false incriminating evidence, ignoring exculpatory evidence and

applying systemic pressure to implicate Plaintiffs in a fraud scheme.  (Am.

Comp. ¶¶ 25 and 26.)  They allege the investigation that was conducted "shocks

the conscience" and is a violation of the Fourteenth Amendment due process

clause.

To state a substantive due process claim, Plaintiffs "must

demonstrate *both* that the [County's] conduct was conscience-shocking, *and* that

the [County] violated one or more fundamental rights that are 'deeply rooted in

this Nation's history and tradition, and implicit in the concept of ordered liberty,

such that neither liberty nor justice would exist if they were sacrificed.'"

Karsjens v. Piper, 845 F.3d 394, 408 (8th Cir. 2017) (citations omitted).  To

determine whether the County's actions are "conscience shocking" the Court

should consider whether the state defendant's actions were "egregious or outrageous." Id. "To meet this high standard, we have explained that the alleged substantive due process violations must involve conduct 'so severe . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" Id.

Based on its review of the entire record, the Court finds that Plaintiffs have failed to allege conduct on the part of the County that is so egregious and outrageous as to support their § 1983 claim. See e.g., Folkerts v. City of Waverly, 707 F.3d 975, 982 (8th Cir. 2013) (dismissing claim of reckless investigation premised on alleged deficiencies, that it was done in retaliation for acts of a relative, and that it was based on an invalid finding of wrongdoing).

As set forth in the maltreatment report, Rosati was interviewed with his consent and with legal representation. (Id. Ex. E (Dep. Ex. 64).) The report also asserts that he was unable to adduce evidence of a complete down payment and all other required payments – which were bases for the finding of maltreatment. While that finding was later reversed, the investigation and findings do not shock the conscience as a matter of law because the reasons for the investigation,

the manner in which it was conducted and the ultimate conclusion was supported by sufficient evidence to meet the low evidentiary standards at issue.

The record further demonstrates there was reasonable suspicion to allow for the initiation of an investigation of maltreatment of a vulnerable adult because the available evidence showed: 1) a land transaction involving a categorical vulnerable adult; 2) documents that indicated a cash down payment was made, but no evidence to show such payment was made; 3) monthly payments were required but insufficient evidence to substantiate all payments were made as set forth in the CD; and 4) the categorical vulnerable adult stated she may have been tricked.

Plaintiffs, at best, cast mere doubt on the investigation procedures used by the County, which as a matter of law, is insufficient to meet the rigors of the standard necessary to establish a substantive due process claim. Davis v. White, 794 F.3d 1008, 1015 (8th Cir. 2015) ("'Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to' the conscience-shocking level.")

In response, Plaintiffs argue that the act of conducting a reckless investigation, in and of itself, is a deprivation of their liberty interest, citing

Brady v. Maryland, 373 U.S. 83, 87 (1963) (stating "our system of the

administration of justice suffers when any accused is treated unfairly").

Plaintiffs claim a reckless investigation is established where it is demonstrated

there was systemic pressure to implicate Plaintiffs in the face of evidence to the

contrary. However, when construing the facts alleged in favor of Plaintiffs, the

Court finds Plaintiffs have failed to demonstrate there are genuine issues of

material fact as to whether the maltreatment investigation was conducted in such

a way as to violate Plaintiffs' substantive due process rights. In addition, as set

forth below, some of Plaintiffs' claims are not supported by the record.

### a. Conflict of Interest

Plaintiffs allege that Rybak's conflict of interest is well documented, and

further assert that by shredding her case notes, Plaintiffs are prevented from

knowing the true extent of the impropriety of the investigation against them.

The issue of shredding documents was the basis for Plaintiffs' motion for

sanctions. That motion was denied by Order dated January 27, 2020 issued by

Magistrate Judge Brisbois. (Doc. No. 42) Plaintiffs did not appeal that Order. As

set forth in the Order, Rybak took case notes pertaining to her investigation, and

over the course of the investigation, she wrote a Summary of Investigation

Report.  As she wrote that summary, she incorporated her case notes into it, and then shredded the case notes when the report was completed.  (Order at 2). Because the Magistrate Judge denied Plaintiffs' request for adverse inferences based on such shredding, an Order Plaintiffs did not appeal, Plaintiffs cannot argue such adverse inferences in opposition to the summary judgment motion. Accordingly, the shredding allegations will not be considered in determining whether Plaintiffs can successfully oppose summary judgment on the substantive due process claim.

Plaintiffs' claims of systemic pressure to implicate them because of an alleged personal relationship between Rybak and Rosati nine years prior must be viewed in light of the fact that the information and documentation Rybak received from SB and Rosati surrounding the land transaction supports a reasonable suspicion that maltreatment may have occurred.  As set forth above, Rybak's suspicions were confirmed by Weiner.  Other than Rosati's belief that Rybak must have been motivated by a personal bias, there is no evidence in the record to support a claim of bias on Rybak's part.

Plaintiffs' claim that the investigation was reckless as evidenced by the fact that Rosati's political rivals were involved in the investigation also do not rise to

the level of egregious conduct required to support a § 1983 claim.  They argue

that prior to the Pine County Attorney's Office recusing from the investigation,

the County Attorney, Reese Frederickson, spoke with Weiner on several

occasions, as is evidenced in the Statement of Maltreatment Record.  (Schwie

Decl., Ex. K. at 1087 (Weiner spoke with county attorney and set up meeting with

Chisago Co. investigator), at 1040 (on May 14, 2018 Weiner spoke with Reese

[Pine County Attorney] regarding release of file), at 1076 (Weiner spoke with

county attorney who counseled it was okay to proceed with investigation

without cooperation of Rosati and his attorney), at 1074 (reviewed petition for

conservatorship with county attorney).)

Plaintiffs further claim that Sheriff Nelson was involved in the

investigation before the office recused sometime in August 2017 and that Nelson

helped Weiner prepare for her interview of Rosati, helped create a plan to enter

the property without a warrant and assigned Pine County Deputy Bradley

Carlson to the investigation.  (Schwie Decl., Ex. K.)  Even after the investigation

was transferred to Chisago County, Plaintiffs allege that Nelson and Carlson

were identified as persons in the "need to know" category and would have been

one of the decision-makers that removed the investigation from the typical Adult

Protection process.  (Anderson Aff., Ex. AA (Dep. Ex. 68 (email from Rybak

suggesting that publication of any information on SB be limited or refrain from

speaking about it at future APS meeting due to the multiple confidential

investigations because of concern that such investigations would be

compromised.)

Plaintiffs further argue that Nelson and Frederickson lied about their

involvement in the investigations when they testified at their depositions that

they did not recall the conversations they had with Weiner, or because their

testimony conflicted with Weiner's chronological report.

Even assuming Nelson and Fredrickson lied about their involvement in

the investigation, Plaintiffs have not demonstrated that the alleged involvement

of Nelson or Fredrickson violated their substantive due process rights.

For example, Plaintiffs claim that Weiner worked with Nelson and

investigator Carlson to go to SB's property.  But Plaintiffs do not claim that such

a visit took place.  Plaintiffs further claim that Fredrickson reviewed the

conservatorship petition.  Fredrickson denies that he did, but even if he had,

Plaintiffs have not demonstrated how reviewing a conservatorship petition,

without more, violated their rights.  (Schwie Decl. Ex. M (Fredrickson Dep. at 12).)

### b.  Fabrications in Report

Plaintiffs' claims of manufactured evidence do not rise to the level of conduct that shocks the conscience.  For example, they allege that in Weiner's report, she stated that Cheryl Bjerke – the notary present when SB signed the CD and TODD – claimed she did not know SB's level of competency.  (Id. Ex. E (Weiner Dep. Ex. 64 at 1760 (summarizing conversation with C. Bjerke, who told her she was did not know SB's level of competency.)  At her deposition, however, Ms. Bjerke denied making the statement to Weiner.  (Id. Ex. B (C. Bjerke Dep. at 63); but see Ex. E (Weiner Dep. Ex. 81 (transcript of Weiner's interview with C. Bjerke in which she stated that SB appeared to be mentally competent).)

Plaintiffs further note that in her report, Weiner stated there was no evidence that Rosati learned of SB's cognitive test scores.  (Id. Ex. E (Weiner Dep. Ex. 64 at 1761 "There is no evidence in care conference notes that show Jared present for a cognitive score being given.")  Plaintiffs claim that Missy Hermanson told investigators that Jared attended care conferences and would

have learned of SB's cognitive test scores at that time.  (Anderson Aff. Ex. 89a).

The chronology summary from 2016, however, only indicates that Rosati was

present at an after-care conference where the need for additional cognitive

testing was discussed, not that test scores were discussed.  (Anderson Aff., Ex.

AA (Dep. ex. 87 at 001718).)

Plaintiffs also argue the maltreatment report was fabricated based on the

fact that Weiner only cited to cognitive testing of SB that took place seven

months after the CD and TODD were signed.  (Id. Ex. E (Weiner Dep. Ex. 64 at

1760).)  However, the record actually shows that Weiner also wrote that SB had

been suffering from hallucinations, cognitive changes, confusion etc. as of March

2016 and that in April 2016 she had been diagnosed with early onset Alzheimer's

disease without behavioral disturbance.  Id.

Plaintiffs further assert that a cognitive test from June 2016 showed that SB

scored a 5.4 – and the average score is 5.6.  (Anderson Aff., Ex. AA (Dep. ex. 75 at

437).)  Test scores from September 2017, however, showed that SB was

moderately impaired.  (Id. at 446.)

Plaintiffs also note that Weiner reported that SB's nurse practitioner told

her she did not believe SB had the ability to make a competent decision on a legal

document, but what she actually said was that SB was not a great decision maker and could be easily fooled or tricked.  (Schwie Decl. Ex. E (Weiner Dep. at 111); Anderson Aff. Dep. Ex. 76a (Allison Romstad Transcript at 8).)

Finally, Plaintiffs claim Weiner fabricated the report by stating there was no evidence that SB received any visa cash cards from Rosati, but the record shows that Rybak saw the cash cards in SB's room and photographed them.  (Id. Ex. E (Weiner Dep. Ex. 64 at 1761); Ex. F (Rybak Dep. at 159).)  The maltreatment investigation summary, however, states there was no evidence that Rosati gave the cards back to SB after his failed attempt to deposit them in her bank account – not that there was no evidence the cards existed.  (Id. Ex. E (Weiner Dep. Ex. 64 at 9).)

Accordingly, the Court finds these allegations do not support their § 1983 claim.  See Dean v. Searcey, 893 F.3d 504, 516 (8th Cir. 2018) (finding that claim of manufacturing evidence must be proven by evidence that defendant made up false evidence as against one of the plaintiffs during the investigation, defendant did so intentionally and that as a direct result of such action, the plaintiff suffered damage).

### c.  Ignored Exculpatory Evidence

Plaintiffs' claims of ignored exculpatory evidence also fails to demonstrate the type of egregious conduct that is required to establish a § 1983 claim.  For example, Plaintiffs assert that Weiner did not acknowledge the Settlement Agreement in which the parties agreed the CD and TODD were valid and were not the product of deceit, mistake, undue influence, fraud, a lack of capacity, or any other condition that would invalidate the CD and TODD.  (Id. Ex. E (Weiner Dep. Ex. 84 ¶ 4).)  Plaintiffs cite to no authority which would require Weiner to conclude her investigation based on the parties' settlement.

Plaintiffs also claim that Weiner did not acknowledge that in June 2016, Kathy Borowick, a Pine County Adult Protection Services investigator determined SB has the capacity to live independently, and despite physical limitations, SB appeared to have the capacity to make decisions on her own and obtain assistance when needed.  (Anderson Aff., Ex. 87.)  The County also did not acknowledge that cognitive testing showed SB was cognitively intact from June 2016 through June 2017.  (Id. Ex. 75 at 446.)   The record shows, however, that SB never did return to her home, and when SB was interviewed by Rybak in July 2017, SB provided contradictory statements as to her understanding of the terms of the sale, and how she believed she may have been tricked concerning

the sale of her home.  (Schwie Decl., Dep. Ex. 105 (Transcript of Second Interview at 50).)

Plaintiffs further claim there is evidence that PCHHS, with SB and Rosati, together planned the purchase of the property.  (Id. Ex. 74 at 1724, 1728.)  The cited evidence does not support this claim.  Rather, it shows only that Rosati informed case worker Karen Engh that he was helping SB out, and that SB was planning on selling her home.

Plaintiffs also claim that PCHHS told SB she had to sell her home.  (Id. at 1728-30, 1737.)  Again, the record does not support this claim.  The documents cited describe removing SB to a nursing home for her safety and documents that the County received phone calls from Rosati complaining that SB was removed from her home.

Plaintiffs also challenge the exclusion of other evidence that Weiner had favorably scored SB's mental health in an initial assessment.  The document cited to, however, shows "Significant cognitive function concern."  (Id. Ex. 67.)

### d.  Ignored Leads

Similarly, Plaintiffs' claims of ignored leads do not demonstrate the requisite conduct that shocks the conscience to establish a § 1983 claim.

For example, Plaintiffs assert that a family member of Weiner's, Janet Weiner, is a real estate agent who worked with SB on a previous property transaction that had been investigated for fraud.  Weiner failed to admit prior to submitting her report that Janet Weiner helped her buy a home, and spoke with her on a weekly basis, while telling Rosati she had no relationship with Janet Weiner.  Plaintiffs claim Weiner's relationship with Janet Weiner was a conflict that should have been disclosed.  Assuming without deciding the relationship should have been disclosed, Plaintiffs have not shown how this conflict affected the maltreatment investigation to the detriment of Plaintiffs.

As for the remaining claims of ignored leads, the Court finds they do not refute any of the evidence upon which Weiner relied in making her maltreatment determination.  At best, such evidence shows that others tried to help SB in the past or took advantage of her.

For example, Plaintiffs further point out that in March 2016, one of SB's neighbors, Sharon Fore, told APS case worker, Karen Engh, that she "has about washed her hands of the deal afraid someone will point a finger at her trying to help [SB]."  (Anderson Aff., Dep. Ex. 74 at 1729.)  Weiner stated in her deposition that she would have wanted to know this information.  (Schwie Decl. Ex. E

(Weiner Dep. at 89).)  Another neighbor, Missy Hermanson, told an investigator

that SB had given her $900 for safekeeping.  (Anderson Aff., Ex. 77a at 6.)

Plaintiffs assert there was no follow up to determine whether the money came

from Plaintiffs.

Plaintiffs also claim that the County ignored evidence that SB told a social

worker that her step grandson stole money from her.  (Schwie Decl., Ex. K at 63.)

Weiner did not follow up on this report despite the fact that she is a mandated

reporter.  Similarly, Missy Hermanson told Weiner that SB's stepson and

grandson stole SB's farm equipment, but Weiner did not report it.  (Anderson

Aff. Dep. Ex. 77a at 10; Schwie Decl, Ex. E (Weiner Dep. at 119).)  Weiner testified

at her deposition, however, that she did not report it because it had already been

reported.  (Id.)

### e.  The County Strayed from Policy

Finally, Plaintiffs claim that the investigation was conducted recklessly as

demonstrated by the fact that Weiner involved Rybak in her investigation,

despite the conflict between Rosati and Rybak.  In support, Plaintiffs cite to

defense expert Michael Hannay's report, in which he stated that a report made to

MAARC is mandated by the Vulnerable Adults Act ("VAA") and the VAA takes

the investigative process out of the hands of the fraud unit (Rybak) and places it

wholly and completely with APS.  (Anderson Aff. Ex. BB (Dep. Ex. 126 at 6).)

Plaintiffs appear to argue that because the investigation was wholly within APS,

Rybak should not have provided any information or assistance to Weiner.

Plaintiffs further claim that Weiner was intimately involved with the

criminal investigation conducted by Chisago County, as evidenced by the fact

that Weiner and Chisago investigator Patrick LeVasseur attended witness

interviews together and exchanged text messages, emails, interview notes and

evidence.  (See e.g. Anderson Aff., Dep. Exs. 76a, 77a and 79.)  Weiner also

suggested to Chisago County that it delay making a charging decision until after

the conservatorship proceedings were concluded.  (Schwie Decl. Ex. E (Weiner

Dep. at 143).)  Pursuant to Weiner's testimony, however, the conservator was

concerned about the criminal investigation interfering with the conservatorship

proceedings and that the conservator asked the County to hold off on its

investigations.  (Id. at 144-45.)

Plaintiffs further allege that the County did not complete the investigation

within 60 days as required by statute, citing to Minn. Stat. § 626.557, subd. 9c(e).[2]

---

[2] This statute provides that the lead investigative agency shall issue a final disposition within 60
calendar days, and if a final disposition is not reached within this time period, the agency shall

Wiener submitted two 60-day extensions, claiming to be continuing to collect and evaluate facts.  (Anderson Aff., Dep. Ex. 78.)  Text messages between Weiner and LeVasseur suggest Weiner wanted to hold off sending her determination to Rosati because he could appeal and that could affect the conservatorship proceedings.  (Id., Dep. Ex. 79; Schwie Decl., Ex. E (Weiner Dep. at 146).)  Plaintiffs claim that would be an improper reason to delay a final determination in the maltreatment investigation.

Plaintiffs also complain that Weiner did not check for other PCHHS investigations concerning SB.  If she had, she would have seen that in June 2016, Kathy Borowick determined SB to be competent to make her own decisions and had been working with Plaintiffs to buy her property.

Plaintiffs also argue that PCHHS violated Minnesota DHS policies governing applicants' land-sale transactions.  The CD is treated as an asset, and so long as it is for fair market value, the applicant need only try to sell the CD.  With regard to the TODD, the County need only file a Medical Assistance lien and could then collect the outstanding debt upon death.  Plaintiffs argue that if

---

provide notice to the vulnerable adult if the agency knows them to be aware of the investigation and the facility, where applicable.  The notice shall contain the reason for the delay and the projected completion date.  Further notices may be sent, as long as the notification will not endanger the vulnerable adult.

PCHHS had simply followed the rules, the reckless fraud and maltreatment

investigations never would have taken place.

These allegations, taken together and in view of the record as a whole, do

not describe conduct that shocks the conscience. The record shows that the

investigation was conducted substantially in accord with PCHHS policies. The

investigator conducted a number of interviews in order to obtain a full

understanding of the circumstances surrounding the land transaction between

Plaintiffs and SB, and the final reports were made by the investigator in charge

based on all the evidence and testimony obtained during the investigation.

Thereafter, the investigator's finding was affirmed on reconsideration by Rebecca

Foss. Any inconsistencies pointed out by Plaintiffs do not rise to the level of a

substantive due process violation. See Amrine v. Brooks, 522 F.3d 823, 833-34

(8th Cir. 2008) (officials have the opportunity to deliberate over various

alternatives throughout an investigation and it is not a due process violation

unless it was done intentionally and recklessly thereby shocking the conscience).

Because Plaintiffs have failed to show there are genuine issues of material

fact as to whether their substantive due process rights were violated, the Court

finds the County is entitled to summary judgment on Count II, violation of §

1983.

C.     **State Law Claims**

1.     **Count I – Falsifying Maltreatment Reports Under Minn. Stat. § 626.557.**

Plaintiffs claim that Rybak included false statements in her two MAARC

reports in violation of Minn. Stat. § 626.557, subd. 6.  A reporter is only immune

from suit when making the report in good faith.  Minn. Stat. § 626.557, subd. 5.

The County argues that summary judgment is appropriate with respect to

this claim as there is no genuine issue of material fact as to whether Rybak had a

good faith belief that maltreatment may have occurred.  As a result, she is

entitled to immunity.  See J.E.B. v. Danks, 785 N.W.2d 741, 749 (Minn. 2010)

(construing similar statute regarding abuse of minors).

Minnesota courts construe good faith "liberally so as to encourage people

to come forward with reports without fear of reprisal."  Id.  On the other hand, a

reporter will not be entitled to immunity "who knowingly or recklessly makes a

false report."  Id.; Minn. Stat. § 626.557, subd. 6.  The Minnesota Supreme Court

has recognized that good faith is a matter of subjective intent and found that "a

report made without an ulterior motive, made without malice and made for a

proper purpose would be a report made in good faith." <u>Id.</u> "Under this standard, 'the relevant question is whether the reporter honestly believed she had a duty to report. A reporter acting in good faith will be immune even if she is negligent or exercises bad judgment.'" <u>Id.</u>

The Court finds that the record in this case supports a finding that Rybak submitted the MAARC reports in good faith. The record demonstrates that Rybak's first MAARC report arose out of conflicting evidence obtained from property records, her welfare fraud interview with SB and a subsequent phone call with Jared Rosati. Such evidence included: SB's property had been transferred; SB was a vulnerable adult; an attorney who did not represent SB had drafted the CD and TODD; SB had not reported the income; SB could not clearly articulate what occurred; and written documentation of the transaction conflicted with oral statements from Jared Rosati, who benefitted from the transaction with SB.

The second MAARC report was based on additional evidence from a second interview with SB, during which she stated Jared tricked her and that Jared had recently become her power of attorney.

Even taking into consideration Plaintiffs' claim that Rybak had a failed relationship with Jared Rosati in 2009, the evidence shows that she had a reason to believe maltreatment may have occurred in 2017.  See Zean v. Mary T. Inc., 2019 WL 1758015 (Minn. Ct. App. April 22, 2019) (fact that maltreatment report was not substantiated does not equal lack of good faith); Central Specialties, Inc. v. Todd Cty, Minn., 2014 WL 1875843, at *7 (Minn. Ct. App. May 12, 2014 (finding that "[g]ood faith is typically a question of fact to be determined by a jury" but that "[n]o genuine issue of material fact exists for trial "when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions").

Accordingly, the Court finds there was sufficient evidence to support a reasonable belief that maltreatment of SB had occurred and that Rybak acted in good faith by filing the MAARC reports.

### 2.    Malicious Prosecution/Abuse of Process

The County asserts that investigators and prosecutors may not be held liable under a theory of malicious prosecution where they acted in good faith.

See Lundberg v. Scoggins, 335 N.W.2d 235, 236 (Minn. 1983) (finding that public policy favors prosecutions and affords such protection of another in good faith and on reasonable grounds as is essential to public justice).

The County asserts that the record demonstrates the maltreatment investigation was commenced and conducted in good faith. In addition to the MAARC reports, the County points out that a state court affirmed the need for a conservatorship and a review of the property transaction at issue. The standard for commencing a conservatorship is whether there was clear and convincing evidence of a need to establish a conservatorship to protect SB's financial affairs and property. See In re Conservatorship of Edelman, 448 N.W.2d 542, 546 (Minn. Ct. App. 1989); see also Minn. Stat. § 524.5-401, subd. 2. The County argues that the commencement of the conservatorship is substantially dispositive of the outcome here, given that federal courts do not have the authority to review final judgments of a state court. See D.C. Court of Appeals v. Feldman, 460 U.S. 462, 482 (1983). The County asserts that Weiner's initial decision of maltreatment and Foss's subsequent decision to uphold the finding of maltreatment is immune from attack and was in good faith as a matter of law. Weiner, then Foss,

reasonably concluded there was sufficient evidence to allow for probable cause to believe wrongful conduct occurred.

The fact that there may have been mistakes made during the investigation is not dispositive.  The Court must look to the record as a whole, and after resolving all inferences in favor of the nonmoving party, decide whether the investigation was conducted in good faith.  J.E.B., 785 N.W.2d at 751.

The Court finds the decision to commence the maltreatment investigation is supported by the two MAARC reports and that a state court concluded there was "clear and convincing evidence" that SB was in need of protective services in the form of a conservatorship and to address the propriety of the property transaction with Plaintiffs.  An enforcement action may be taken even if the victim has since been rendered whole.  See generally Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982); Clay v. Conlee, 815 F.2d 1164, 1169 (8th Cir. 1987) (a finding of probable cause is not vitiated by victim later withdrawing claimed harm).

Other than speculation that Rybak was bitter about a past failed relationship, there is no evidence to support the claim that Rybak acted in bad faith when she provided information to the maltreatment investigator. Accordingly, the Court finds that Plaintiffs have not demonstrated there are

genuine issues of material fact as to whether the maltreatment investigation was commenced and thereafter conducted in good faith.

The same can be said about Plaintiffs' claims that the Pine County Sheriff and County Attorney participated in the investigation to "get back" at Rosati. As the record demonstrates, these offices recused from the investigation, and as to any participation in the investigation prior to recusal, there is no evidence of a bad faith motive by Nelson, his deputies or the County Attorney – just speculation.

The elements of an abuse of process claim are 1) the existence of an ulterior motive and 2) the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued. Pow-Bel Const. Corp. v. Gondek, 192 N.W.2d 812, 814 (Minn. 1971). "[T]he test is whether the process was used to accomplish an unlawful end for which it was not designed or intended, or to compel a party to do a collateral act which he is not legally required to do." Kittler & Hedeslon v. Sheehan Props., Inc., 203 N.W.2d 835, 840 (Minn. 1973). "Mere indirect injury to a person's name or reputation is insufficient to constitute abuse of process." Id.

Plaintiffs argue that Deposition Exhibit 79, which are text messages between Weiner and Chisago County investigator Levasseur, show that PCHHS used the maltreatment investigations to get a more favorable outcome in the ongoing conservatorship proceeding and criminal investigation.  Further, PCHHS delayed the maltreatment investigation twice based on a suggestion from the conservator to prevent an appeal or the surfacing of new information that could hurt the criminal investigation or the conservatorship proceeding.

Plaintiffs have not put forth any evidence, other than speculation, to support this claim.  The fact remains, however, that Plaintiffs entered into a settlement with the conservator, and that such agreement provided a favorable result to Plaintiffs.  The settlement provided that the "CD and TODD were valid documents and not the product of deceit, mistake, undue influence, fraud, lack of capacity, or any other condition that would invalidate" those documents.  (Id. Ex. E (Weiner Dep. Ex. 84 at ¶ 4).)  The fact that Plaintiffs may have suffered injury to their reputation because a conservatorship proceeding and a maltreatment investigation was commenced, without more, does not establish a claim for abuse of process.  Kittler & Hedeslon, 295 Minn. at 239, 203 N.W.2d at 840.

The Court thus finds that the County is entitled to summary judgment on these claims.

### 3.      Defamation Claim

The County asserts dismissal of the defamation claim is appropriate because it is not pleaded with the required specificity and any statements were privileged.

To be actionable, a claim of defamation must be 1) pled with sufficient specificity; 2) provably false; 3) published; and 4) not otherwise barred by privilege.  Maethner v. Someplace Safe, Inc., 929 N.W.2d 868, 873 (Minn. 2019). In their Amended Complaint, Plaintiffs claim they were defamed when "Ms. Weiner and PCHHS communicated information it knew was false to S.B.'s conservator intending for that false information to be published in an open and public forum – Pine County District Court."  (Am. Comp. ¶ 56.)  They further point to the allegations of false statements in the MAARC report – set forth in ¶¶ 1-9 in Count I – to support their defamation claim.  (Id. ¶ 57.)  In addition, Rosati testified that his defamation claim relates to statements made to the conservator, but he was unable to identify the subject of the defamation, and by whom. (Schwie Decl., Ex. D (J. Rosati Dep. at 137-38).)

Plaintiffs assert that defamatory statements were made by county employees to the conservator, which were then used to form the basis of the petition, not the filing itself.  Plaintiffs do not identify any particular statements made to the conservator outside of the filing that form the basis of their defamation claim.

Plaintiffs further claim that Weiner did not interview Wendy Rosati because she had ruled her out as a suspect but did not so inform the conservator. In support, they cite to an email dated November 29, 2017, from the conservator's attorney to Weiner, asking her to confirm the factual background set forth in the petition.  (Anderson Aff., Ex. GG.)  Plaintiffs do not, however, identify any statement made to the conservator that would have incriminated Wendy Rosati.

Plaintiffs further assert that Jared Rosati heard gossip about the conservatorship proceeding and that people expressed their belief that Jared was no longer to be trusted with property sales.  Plaintiffs do not, however, establish that any of the named defendants made any statements, outside of the proceedings involved, to perpetuate false gossip about Jared Rosati.

Even if Plaintiffs had identified specific statements alleged to be

defamatory, statements made during the course of an investigation are protected

by a qualified privilege where there is no evidence a statement was made with

actual malice.  Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 924 (Minn. 2009)

(statements made during harassment investigation not actionable without a

showing of actual malice).  Further, statements made during a judicial

proceeding are entitled to an absolute privilege.  Matthis v. Kennedy, 67 N.W.2d

413, 419 (Minn. 1954) (absolute privilege accorded statements made during

judicial proceedings).

As set forth above, the MAARC reports and the maltreatment

investigation were commenced based on a reasonable suspicion of wrongdoing

on the part of Plaintiffs.  Their claims of bias by Rybak and others do not create

genuine issues of material fact that any of the individual defendants made any

alleged defamatory statements with actual malice.  Accordingly, the Court finds

the defamation claim must be dismissed.

### 4.   Minnesota Government Data Practices Act Claim

The Minnesota Government Data Practices Act ("MGDPA") governs the storage of government data and public access to that data.  Minn. Stat. § 13.01-.90 (2018).  Section 13.08, subd. 1 provides:

> [A] responsible authority or government entity which violates any provision of this chapter is liable to a person * * * who suffers any damage as a result of the violation, and the person damaged * * * may bring an action against the responsible authority or government entity to cover any damages sustained, plus costs and reasonable attorney fees.

On August 22, 2018, Plaintiffs' attorney made a data request to the County for the "file regarding both Jared and Wendy Rosati's lawful purchase of property from [SB] via contract for deed."  (Schwie Decl., Ex. D (J. Rosati Dep. at 117, Dep. Exs. 31 and 32).)  The County asserts that it responded that it was not in the possession of any "files" on the Plaintiffs' purchase of SB's property.  Instead, the County was in possession of "files" related to possible medical assistance fraud by SB, and possible maltreatment of SB.  Accordingly, the County argues it did not violate the MGDPA by failing to produce anything in response to Plaintiffs' request for data.  Scheffler v. City of Anoka, 890 N.W.2d 437, 447 (Minn. Ct. App. 2017).

Plaintiffs' attorney then requested the maltreatment file pertaining to SB, and the County began to compile the documents responsive to this request.

From September 18, 2018 through November 2018, the County produced the documents to Plaintiffs on a rolling basis – totaling approximately 2,000 pages.

Plaintiffs argue that the County wrongfully withheld critical pieces of data in an effort to conceal the conspiracy against Plaintiffs within the County.  In support, Plaintiffs argue in their opposition brief that the County violated the MGDPA when Rybak shredded her case notes and witness interview notes throughout her financial fraud investigation.  In their Amended Complaint, however, Plaintiffs did not allege that the County violated the MGCPA when Rybak shredded her case notes, nor did Plaintiffs move to amend their complaint to add such allegation.  As a result, the Court will not, at the summary judgment stage, consider whether the County violated the MGDPA when Rybak shredded her case notes.

With respect to the County's assertion that Plaintiffs' first request was properly denied because the County did not have any files on the property transaction, Plaintiffs argue the County cannot avoid its responsibilities through semantics.  The County knew it had files of which Plaintiffs were the subject. Therefore, it violated the MGDPA when it initially denied it had the relevant

files.  The County was also required to state the specific reason for denying the request, and the County failed to do so.

Plaintiffs further argue that when the County finally responded to their data request, it left out important documents, such as an email in which Rybak told members of the County to keep the investigations off the APS agenda; photos taken by Rybak of the gift cards that they claimed either did not exist or were not provided or went missing; a contacts list that confirmed Weiner talked to Sheriff Nelson about interviewing Rosati; investigation data; and a handwritten strength and needs assessment.

Finally, Plaintiffs claim that the County was required to establish procedures to ensure requests for data are complied with in an appropriate and prompt manner.  Over the course of the investigation, Plaintiffs had repeatedly asked how to request data, and they were told PCHHS would not release data without a court order.  (Schwie Decl., Ex. K (Dep. ex. 63 at 7); Ex. D (Rosati Dep. ex. 39 at 3).)[3]

---

[3] This citation refers to Plaintiffs' request for the County to identify the MAARC reporter. Because reporters are kept confidential, Defendant refused to identify the maltreatment reporter without a court order.

Construing these facts in the light most favorable to Plaintiffs, the Court finds that this claim is subject to dismissal as they have failed to demonstrate the existence of  any genuine issues of material fact that any of the alleged violations caused them any concrete and particularized damage.  See Moubry v. Indep. Sch. Dist. 696, 9 F. Supp. 2d 1086, 1112 (D. Minn. 1998) (finding plaintiff must show he suffered an injury-in-fact because of defendant's delay in providing material requested).

Plaintiffs received information from Rybak's notes within her final report, and they were not injured when their first document request was denied on the basis that under the specific request, such file did not exist.  Plaintiffs have also failed to show they were injured when they received documents on a rolling basis, or that Plaintiffs had to inquire multiple times about requesting data.  See Demers v. City of Minneapolis, 486 N.W.2d 828, 832 (Minn. Ct. App. 1992). Accordingly, this claim will be dismissed.

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary

Judgment [Doc. No. 43] is **GRANTED** in its entirety.  This matter is dismissed

with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  May 14, 2020

s/ Michael J. Davis
Michael J. Davis
United States District Court